**Dr. Robin SILVER, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**Dr. Robin SILVER, et al., Plaintiffs,**

v.

**Jack Ward THOMAS, et al., Defendants.**

Nos. Civ. 94–337 PHX CAM,
Civ. 94–1610 PHX CAM.

United States District Court,
D. Arizona.

Aug. 24, 1995.

---

Steven Sugarman, Santa Fe, NM, Mark Hughes, Denver, CO, for plaintiff.

Elinor Colburn, U.S. Dept. of Justice Env. & Nat'l Resources Div., Washington, DC, for defendants.

## ORDER

MUECKE, District Judge.

Having considered all of the pleadings [1] relevant to the plaintiffs' motion for partial summary judgment and the defendants' cross motion for summary judgment, the court concludes as follows:

### Background

Plaintiffs seek a determination that the United States Forest Service [USFS] and Bureau of Indian Affairs [BIA] violated section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), when they failed to consult with the United States Fish and Wildlife Service [FWS] about programmatic land management plans that affect the threatened Mexican spotted owl and its critical habitat.

Plaintiffs have filed a motion for partial summary judgment on the first and fourth claims arguing that they are entitled to judgment on these Section 7(a)(2) claims against the United States Forest Service and Bureau of Indian Affairs. Plaintiffs seek injunctive relief as their remedy. The defendants filed a response and cross-motion for partial summary judgment on the same claims.

### Summary Judgment

Summary judgment may be granted if the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.

The disputed fact(s) must be material. *Id.* Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The dispute must also be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In a civil case, the question is:

whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

The moving party who has the burden of proof on the issue at trial must establish all of the essential elements of the claim or defense for the court to find that the moving party is entitled to judgment as a matter of law. *Fontenot v. Upjohn,* 780 F.2d 1190, 1194 (5th Cir.1986); *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, summary judgment is proper if the nonmoving party fails to make a showing sufficient to establish the existence of an essential element of his case on which he will bear the burden of proof at trial. *Id.*

### Undisputed Facts

The following facts are undisputed and the parties have supplied admissible evidence to support those facts:

1. There are numerous parties in this case. Plaintiffs include Dr. Robin Silver, Forest Guardians, Southwest Center for Biological Diversity, Greater Gila Biodiversity Project, Biodiversity Legal Foundation, Carson Forest Watch, Forest Conservation Council, Maricopa Audubon Society, and DINE Citizens Against Ruining Our Environment. Defendants include Jack Ward Thomas, in his capacity as Chief of the USFS, the USFS, Ada Deer, in her official capacity as Assistant Secretary of the BIA and the BIA. Proposed intervenors include Apache County, White Sands Forest Products, Inc. and the Arizona State Land Department. This court has given proposed intervenors amicus status and allowed them to file briefs relevant to dispositive motions.

## A. General facts

The FWS strongly encourages the USFS to undertake programmatic consultations to assess how programmatic land management plans[2] affect the Mexican spotted owl. SOF C.[3] Similarly, the National Marine Fisheries Service [NMFS] has commented that plan-level analysis may be the best method of assessing the broad aggregated incremental effects of forest activities on salmon stocks in the Pacific northwest. SOF C.

Effective April 15, 1993, the Mexican Spotted owl was listed as a threatened species under the Endangered Species Act, 16 U.S.C.A. 1531–1544. 58 Fed.Reg. 14,248 (March 16, 1993). SOF 1.

## B. Facts relevant only to the USFS

Between July 15, 1985 and April 15, 1988, the USFS approved land and resource management plans [LRMPs] for all national forests in the Southwest Region. The USFS conducted formal consultation with the FWS under Section 7(a)(2) of the ESA and implementing regulations on each of these LRMPs prior to adoptions. SOF 2.

In November of 1993, the USFS initiated informal consultation on amending the LRMPs in conjunction with the NEPA scoping process to incorporate management direction for the Mexican spotted owl. SOF 3. The USFS initiated informal consultation on "all relevant aspects of the Forest Plans" as of May 1, 1995. SOF A, 4. The USFS stated that it would move into formal consultation on these plans once amendments to the plans were developed by the USFS to incorporate standards and guidelines for the management of the Mexican Spotted owl, which was expected to occur by early July of 1995. SOF A, 4.

On July 14, 1995, the USFS initiated formal consultation with the FWS "on the effects of the Mexican Spotted owl and its critical habitat from implementation of all eleven forest plans as amended with the new standards and guidelines for the Mexican spotted owl and northern goshawk." SOF A, 5. The USFS has made only site-specific consultations on the existing effective LRMPS.

## C. Facts only relevant to the BIA

The BIA approved a ten-year forest management plan [FMP] for the Navajo Nation Forest in 1982. SOF 8. The Navajo Nation Forest plan expired on January 1, 1993. SOF A, 9. The BIA has not approved either a new FMP or an extension of the 1982 FMP. SOF A, 10–11. The BIA has approved at least one major timber sale since the 1982 FMP expired, the Wheatfields timber sale contract in January of 1993, after the FMP expired but prior to the listing of the Mexican Spotted Owl.[4] The BIA allowed harvesting to continue in the Wheatfields and the Whiskey Creek timber sale areas in the summer of 1993, after the Mexican spotted owl was listed as a threatened species, and cutting occurred as recently as June and July.

The BIA is currently working with the Navajo Nation to develop a new FMP in conjunction with a Habitat Conservation Plan [HCP] which will provide conservation plans for the Mexican spotted owl and twenty-seven other species identified as in need of protection by either the Federal government or the tribe. SOF 12. Before the new FMP is approved, both the USFS and FWS must determine that the requirements of the ESA and the National Environmental Policy Act, 42 U.S.C. § 4321–4370d, are met. SOF 13. Since the Mexican Spotted owl was listed as a threatened species, no road building related to timber projects or other related improvement projects in the Navajo Nation Forest have been approved or undertaken by the BIA. SOF 14. Since the Mexican spotted owl was listed as a threatened species, no timber sales or cuts have been approved or undertaken by the BIA. SOF 15. Although the Toh-nit-sa Timber sale was approved by the Navajo Tribe in October of 1993, prior to

---

2. See pages 983–984 of this opinion for explanation of programmatic land management plans.

3. SOF refers to the statements of fact filed by the parties.

4. Effective April 15, 1993, the Mexican Spotted owl was listed as a threatened species under the Endangered Species Act, 16 U.S.C.A. 1531–1544. 58 Fed.Reg. 14,248 (March 16, 1993).

filing of this lawsuit, the BIA did not approve the sale because no FMP was in place. SOF 16. The BIA must ensure that both the NEPA and ESA have been complied with before it may approve the Toh-nit-sa Timber sale or any other commercial timber sale or related road building or improvement projects in the Navajo Nation Forest. SOF 17.

Neither the plaintiffs in this action, nor any other party, have taken an administrative appeal from any of the alleged action or omission of the BIA regarding activities in or related to the Navajo Nation Forest since the Mexican spotted owl was listed as threatened. SOF 18.

*Discussion*

Plaintiffs argue that they are entitled to partial summary judgment that the defendants have violated Section 7(a)(2) of the ESA by failing to consult with FWS on their programmatic land management plans; the USFS Land and Resource Management Plans [LRMPs], Interim Directive Number Two [ID2], Management Recommendations for the Northern Goshawk [MRNG] and the BIA-approved Forest Management Plan [FMP]. As a matter of law, plaintiffs argue, the LRMPs and FMP trigger the ESA consultation obligations. Defendant USFS argues that it is entitled to partial summary judgment because the USFS initiated formal consultation on the effects of the LRMPs, as amended, on the Mexican spotted owl on July 14, 1995 [on the same date the plaintiffs' filed their motion]. Therefore, the USFS argues, the plaintiffs' section 7(a)(2) claim is moot. Relevant to the Indian lands, the defendant argues that the BIA is entitled to judgment on that claim because the last BIA approved FMP expired on January 1, 1993. Thus, no FMP exists and there is no duty to consult.

**A. Section 7(A)(2) of the ESA**

Section 7(a)(2) of the ESA requires that the Secretary of the Department of Interior ensure that action by federal agencies does not jeopardize threatened or endangered species. Section 7(a)(2) provides:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such an agency

(hereinafter in this section referred to as an "agency action") **is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary after consultation as appropriate with affected States, to be critical,** unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C.A. § 1536(a)(2) (1985) (emphasis added).

Section 7(b) sets forth the process of consultation. 16 U.S.C.A. § 1536(b) (1985 and West supp.1995). FWS regulations that guide implementation of the consultation requirements of Section 7(a)(2) provide that the federal agencies consult with the appropriate agency, the FWS in this case, on every action that "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a). If the action agency determines that its action is "likely to adversely affect" a protected species, it must engage in formal consultation which requires the consulting agency to issue a biological opinion determining whether the action is likely to jeopardize the listed species and describing, if necessary, reasonable and prudent alternatives that will avoid the likelihood of jeopardy. 16 U.S.C.A. 1536(b)(3)(A); 50 C.F.R. § 402.14; *Pacific Rivers,* 30 F.3d 1050, 1054 (9th Cir.1994). But if the action agency determines that an action is "not likely to adversely affect" the species, it may attempt informal consultation. 50 C.F.R. 402.13(a). The consulting agency must issue a written concurrence in the determination or may suggest modifications that the action agency could take to avoid the likelihood of adverse effects to the listed species. 50 C.F.R. 402.13(b) If no such concurrence is reached, the regulations require that formal consultation occur. 50 C.F.R. 402.14.

An agency must hold action in abeyance until the required consultation is complete. 16 U.S.C.A. § 1536(d) provides:

After initial consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C.A. § 1536(d) (1985).

Thus, implementation of action, in this case the LRMP or FMP, prior to the completion of the Section 7(a)(2) consultation constitutes a violation of the ESA if the action constitutes "irreversible or irretrievable commitment of resources." 16 U.S.C.A. § 1536(d) (1985). The Ninth Circuit has addressed the operation of Section 7(a)(2) relevant to programmatic land management plans in *Pacific Rivers Council v. Thomas,* 30 F.3d 1050 (9th Cir.1994) and *Lane County Audubon Society v. Jamison,* 958 F.2d 290 (9th Cir.1992). In those cases, the Ninth Circuit determined that "timber sales constitute *per se* irreversible and irretrievable commitments of resources under section 7(d) [16 U.S.C.A. § 1536(d) ] and cannot go forward during the consultation period." *Jamison,* 958 F.2d at 295 (northern spotted owl); *Pacific Rivers,* 30 F.3d at 1057. The Ninth Circuit held that the district court erred in not enjoining all activity and found that only after the USFS complied with section 7(a)(2) could activity that may affect the protected species go forward.

Therefore, to prevail on their claims, plaintiffs must show that the LRMPs and FMP at issue in this case are "agency actions" within the meaning of Section 7(a)(2) that "may affect" the Mexican spotted owl and that the defendants have failed to consult with the FWS on the LRMPs, ID2, MRNG and FMP.

**1. Are the LRMPs, ID2, MRNG and FMP at issue in this case "agency actions?"**

The first issue that this court must consider is whether the LRMPs, ID2, MRNG and FMP at issue in this case are agency actions. This is an issue of law that has been resolved by the Ninth Circuit in *Jamison. Jamison,*

958 F.2d at 291. In *Jamison,* the plaintiffs argued that the Bureau of Land Management's [BLM] development and adoption of the Jamison Strategy, a programmatic planning document that set forth the criteria for logging on land administered by the BLM in Washington, Oregon and California after the listing of the Northern Spotted Owl as threatened, triggered the consultation requirement of Section 7(a)(2). *Jamison,* 958 F.2d at 291. The Jamison Strategy set forth management guidelines and established total annual allowable harvests of timber on federal lands. *Jamison,* 958 F.2d at 291, 294. The Ninth Circuit noted that both the FWS and Ninth Circuit interpret "agency action" broadly and concluded that the BLM used the Jamison Strategy to "drive ... development" of individual timber sales. Thus, the court concluded that the programmatic planning documents fell within the scope of Section 7(a)(2). *Jamison,* 958 F.2d at 294.

The Ninth Circuit expanded this holding in *Pacific Rivers,* 30 F.3d at 1056. In that case, the LRMPs for the Wallowa–Whitman and Umatilla National Forests were adopted before the relevant salmon species were listed under the ESA. The plaintiffs argued that the LRMPs were agency action that triggered consultation under Section 7(a)(2). The LRMPs established forest-wide and area-specific guidelines for projects up to 15 years identifying, among other things, lands suitable for timber production and sale of timber. The Ninth Circuit found that the LRMPs constituted "ongoing agency action" that required the consultation process of Section 7(a)(2):

> Given the importance of LRMPs in establishing resource and land use policies for the forests in question there is little doubt that they are continuing agency action under § 7(a)(2) of the ESA.

*Pacific Rivers,* 30 F.3d at 1056.

In this case, as in the *Pacific Rivers* case, the undisputed facts establish that the USFS is amending the LRMPs because of the listing of the Mexican spotted owl. The LRMPs are the land resource management plans for national forests. In this case, the LRMPs make programmatic decisions affecting how forest resources will be utilized over

a ten to fifteen year planning period. An individual LRMP establishes criteria that control timber harvest levels and silvicultural practices in the relevant National Forests. Pursuant to the National Forest Management Act, every site-specific action pursued on National Forest Land must be "consistent" with the programmatic decisions adopted in the pertinent LRMP. 16 U.S.C.A. 1604(i). The ID2 and MRNG are the Region 3 timber sales programs. The ID2 sets forth regional direction for the management of the Mexican spotted owl in Forest Service project areas. It is an interim policy to provide Forest Service land managers guidelines for carrying out active conservation programs to maintain viability of the Mexican spotted owl. The ID2 directs the USFS employees to "apply this management direction to all management activities proposed in suitable and capable habitat." The Forest Service implements the MRNG in currently uninhabited but suitable Mexican spotted owl habitat. The MRNG is a programmatic planning document that drives the configuration of timber sales and other USFS management activities in owl habitat. Thus, as a matter of law, the LRMPs, ID2 and MRNG approved by the USFS are agency actions that trigger the consultation process of Section 7(a)(2) of the ESA. *Pacific Rivers*, 30 F.3d at 1056.

■ Relevant to the BIA, Forest Management Plans that are approved by BIA are also, as a matter of law under the *Jamison* case, agency actions that trigger consultation under Section 7(a)(2). *Jamison*, 958 F.2d at 294. A FMP is a programmatic planning document that guides and constrains the implementation of a tribal timber harvest program. Pursuant to the National Indian Forest Resources Management Act, all timber harvests on tribal lands must be consistent with a BIA-approved FMP. 25 U.S.C. 3104(b). Therefore, the FMP in this case is an agency action that triggers consultation under Section 7(a)(2). *Jamison*, 958 F.2d at 294.

### 2. May the adoption of the LRMPs and FMP affect the Mexican spotted owl?

■ The second issue the court must consider is whether adoption of the LRMPs,

ID2, MRNG and FMP in this case "may affect" the Mexican spotted owl. This issue is also a question of law that has been addressed by the Ninth Circuit in the *Jamison* and *Pacific Rivers* cases. In *Jamison*, the Ninth Circuit found that the BLM approved Jamison Strategy was an "action that 'may affect' the spotted owl since it set forth criteria for harvesting owl habitat." *Jamison*, 958 F.2d at 294. Similarly, in *Pacific Rivers*, the Ninth Circuit found that the USFS LRMPs were "actions that 'may affect' the protected salmon because the plans set forth criteria for harvesting resources within the salmon's habitat." *Pacific Rivers*, 30 F.3d at 1055.

The undisputed facts in this case indicate that the program planning documents in this case are very similar to the documents discussed by the Ninth Circuit in both *Jamison* and *Pacific Rivers*. Like the plans in those cases, the LRMPs, ID2, MRNG and FMP set forth the long-term criteria for harvesting the habitat of the threatened species, the Mexican spotted owl. The USFS is currently amending the LRMPs to account for the listing of the Mexican spotted owl. Thus, any timber sales are "actions that may affect" the spotted owl under *Jamison* and *Pacific Rivers*.

### 3. Have the defendants consulted with the FWS on the effects of the challenged LRMPs, ID2, MRNG and FMP?

The final issue that the court must consider is whether the USFS and BLM have consulted with the FWS on the effects of the LRMPs, ID2, MRNG and FMP at issue in this case.

### a. USFS

■ The undisputed facts establish that the USFS has not consulted with the FWS as required by the ESA. The undisputed facts establish that the USFS has done site specific consultation and has begun consultation on the eleven LRMPs *as amended*.

■ The defendant USFS argues that because it started consultation on the amend-

ment of the eleven LRMPs for National forests in the Southwest Region on May 1, 1995 the plaintiffs' claim is moot. A case is moot where the challenged action or omission has ceased; there is no reasonable expectation that the alleged violation will recur and the effects of the alleged violations have been eradicated. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). A careful review of the undisputed facts establishes that the USFS has failed to initiate consultation on the existing LRMPs. Defendants currently operate a large timber sale program in Arizona and New Mexico which is driven by the existing LRMPs that were developed in the mid–1980s. Defendants state their intent to amend those LRMPs in the future and consult as those LRMPs are amended. The amendments are not yet complete and will not exist until approximately the end of 1995.

The undisputed facts also establish that the government has made only site specific consultations on the existing LRMPs. Plaintiffs argue that as a matter of law, site-specific consultations do not satisfy the ESA's requirements. In *Pacific Rivers,* the USFS made site-specific determinations on approximately 2,400 projects, concluding that about 700 projects were likely to adversely affect the salmon. The USFS voluntarily suspended activity on the 700 projects but allowed the 1,700 projects that it determined were not likely to adversely affect the salmon to continue. The Ninth Circuit held that the district court erred in interpreting section 7(d) to allow ongoing activities when the USFS had failed to enter into consultation as required by section 7(a)(2). *Pacific Rivers,* n. 30 F.3d at 1052. The Ninth Circuit concluded that the USFS conclusion that the activities "may affect" the salmon was sufficient to enjoin *all* of the projects. Thus, until the USFS commences a consultation on the existing LRMPS, as required by *Pacific Rivers,* it is in violation of Section 7(a)(2) of the ESA. In addition, even if the USFS has began consultation on the amendments, *Pacific Rivers* requires consultation on the entirety of the LRMPS. *Pacific Rivers,* 30 F.3d at 1056, n. 12. The biological assessment prepared by defendants is one prepared on the LRMP amendments, not on the

existing LRMPs. The consultation begun by the USFS has no bearing on the ongoing activities that affect the Mexican spotted owl since the LRMPs as amended do not exist; are unlikely to exist in the near future and are entirely unrelated to ongoing and reasonably foreseeable land and resource management activities such as timber harvesting. The development of the proposed amendments is already about fifteen months behind schedule, as they were to be completed by summer of 1994 and the most recent estimate for completion of the amendments is October 15, 1995. *See* 57 Fed.Reg. 28171. Plaintiffs also point out that the October 15, 1995 is unrealistic because the Mexican spotted owl recovery plan upon which the LRMP amendments will be based is still incomplete.

Moreover, the transition period for implementing the amendments makes it clear that the amendments will not guide on-the-ground timber harvest activities until some indeterminate and distant point in the future. Thus, the existing LRMPs could guide timber harvest activities in Arizona and New Mexico for possibly years, when the defendants have not consulted on these existing LRMPS. Thus, the defendant USFS has not complied with the consultation requirements of Section 7 of the ESA.

Defendants argue in their reply that it makes more sense to consult on the LRMPs, as amended, as it would be more efficient and provide more protection for the Mexican spotted owl. However, this argument ignores that undisputed fact that the existing LRMPs control forest management activities and will continue to control those activities until amended LRMPs are complete in the future. This allows the *per se* irretrievable and irreversible commitment of resources, the harvesting of habitat for the owl, to continue until the LRMPs are amended and consultation is complete. Such a finding by this court would be contrary to the ESA and clear Ninth Circuit law.

### b. BIA

#### (1) Is consultation required because there is no plan?

■ The defendant BIA argues that because it has neither approved nor implement-

ed any Navajo Nation Forest Plan since the listing of the Mexican Spotted Owl no consultation is required. Plaintiffs respond that the BIA approved at least one timber sale after the FMP expired but prior to the listing of the Mexican spotted owl and since then has allowed continuing timber harvest without consultation, despite the listing of the owl.

The undisputed facts establish that the Forest Management Plan expired in 1992 and no new plan has been approved. Although no plan has been approved, the BIA has approved at least one timber sale after the FMP expired and prior to the listing of the Mexican spotted owl as threatened and allowed continuation of timber harvest activities after the listing of the Mexican Spotted Owl. It is undisputed that cutting of timber occurred as recently as June and July of this year at the Wheatfield and Whiskey Creek sites. Thus, the timber activities continue, despite the lack of a FMP and consultation with the FWS. Under *Pacific Rivers*, 30 F.3d at 1050, federal agencies may not approve timber sales unless and until the programmatic land management document authorizing those sales has been the subject of a Section 7 consultation with FWS. Thus, the approval of timber sales pursuant to the 1982 FMP must be enjoined until consultation is complete.

### (2) Is the claim not yet ripe for review because there is no FMP?

■ The BIA also argues that plaintiffs' claim is not ripe for review because it has taken no action subject to judicial review. The plaintiffs respond that the BIA continues to authorize commercial timber sales on the Navajo Forest pursuant to the expired 1982 FMP, which was not subject to Section 7 consultation with the FWS. To the extent the government argues that the FMP expired before the Mexican spotted owl was listed, this argument overlooks the fact that the BIA has authorized timber sales under the 1982 FMP after its expiration. In addition, cutting continues under the former FMP. As late as June and July of this year, timber was cut at both the Wheatfield and Whiskey Creek sites. Thus, the claim is ripe for review.

### (3) Is there no case or controversy because there is no plan?

■ Similarly, the BIA argues that no case or controversy exists as there is no new FMP. Plaintiffs respond that there is a case or controversy as they meet the three standing criteria for a case or controversy. Article III, Section Two of the Constitution limits judicial power of the federal courts to cases or controversies. U.S. Const. Art. III, Section 2; *SEC v Medical Committee for Human Rights*, 404 U.S. 403, 407, 92 S.Ct. 577, 579–80, 30 L.Ed.2d 560 (1972). A party seeking to invoke federal jurisdiction under the ESA must allege: (1) injury in fact; (2) a causal connection between the injury and the challenged action and (3) that the injury is likely to be redressed by the relief sought. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

■ First, plaintiffs must establish that they suffered concrete and particularized injuries in fact. Plaintiffs have established that the BIA approved the Wheatfields timber sale prior to the listing and continued timber harvest activities after the listing of the Mexican spotted owl as threatened. This continued timber activity establishes an injury in fact, especially in light of the Ninth Circuit holding that timber cutting constitutes *per se* "irreversible and irretrievable" commitment of resources under Section 7(d) and cannot go forward during consultation. *Jamison*, 958 F.2d at 295; *Pacific Rivers*, 30 F.3d at 1057.

■ Second, plaintiffs must establish a causal connection between the BIA's noncompliance with the consultation requirement and the injury. The connection in this case is clear. Failure to meet the consultation requirement will result in timber harvest without protection for the Mexican spotted owl. Again, *per se* irreversible and irretrievable commitment of resources would occur.

■ Finally, the plaintiffs must establish that it is likely that their injury will be redressed by a favorable decision. An order requiring consultation and an injunction enjoining approval and operation of further

commercial timber harvest until consultation is complete would redress the injury. Thus, the plaintiffs have standing to raise their claim against the BIA.

### (4) Have the plaintiffs failed to exhaust their administrative remedies?

Finally, the BIA argues that plaintiffs have failed to exhaust their administrative remedies. Plaintiffs respond that they are not required to exhaust administrative remedies as exhaustion would serve no practical purpose, exhaustion would be futile and the BIA's appeal regulations do not apply to legal claims made pursuant to the ESA.

■ Generally, an administrative decision of a federal agency cannot be appealed to federal court until the plaintiff has exhausted the prescribed administrative remedies. *Darby v. Cisneros,* 509 U.S. 137, 145–46, 113 S.Ct. 2539, 2544, 125 L.Ed.2d 113 (1993). Whether an action is barred by failure to exhaust administrative remedies is within the discretion of the trial court. *Park County Res. Coun. v. U.S. Department of Agriculture,* 817 F.2d 609, 619 (10th Cir. 1987). Plaintiffs first argue that they are not required to exhaust administrative remedies in this case. The BIA's appeal regulations provide that the BIA regulations do not apply if any other regulation or Federal statute provides a different administrative appeal procedure applicable to the specific type of decision. 25 C.F.R. 2.3(b) Thus, there is an exception where a federal statute provides a different procedure. 54 Fed.Reg. 6478 (Feb. 10, 1989). Under the ESA, the plaintiff must file a 60 day notice of intent to sue prior to filing a citizens' suit. 16 U.S.C. 1540. The purpose of the 60 day notice is to give the offending agency an opportunity to cure the alleged illegality. *Forest Conservation Council v. Espy,* 835 F.Supp. 1202 (D.Idaho 1993). The court believes that this procedure is the type of procedure contemplated under the BIA regulations.[5] Thus, plaintiffs are not required to exhaust any administrative remedies with the BIA prior to filing suit in federal district court for violations of Section 7(a)(2) of the ESA.

■ Moreover, even if plaintiffs were required to exhaust administrative remedies, exhaustion would be waived in this case. Under certain circumstances, courts may depart from the requirement that a plaintiff exhaust all his administrative remedies. Exhaustion is waived if pursuit of the administrative remedies would be futile, *Order of Railway Conductors v. Swan,* 329 U.S. 520, 67 S.Ct. 405, 91 L.Ed. 471 (1947), the administrative agency has indicated that it does not desire to review, *Natural Resources Defense Council v. Train,* 510 F.2d 692 (D.C.Cir. 1974), or the issue being reviewed is a purely legal issue. *McGee v. U.S.,* 402 U.S. 479, 485–86, 91 S.Ct. 1565, 1569–70, 29 L.Ed.2d 47 (1971). In this case, exhaustion would serve no practical purpose in this case. The purpose of exhaustion of remedies is to develop a complete factual record and allow the agency to apply its expertise and discretion. *White Mountain Apache Tribe v. Hodel,* 840 F.2d 675, 677 (9th Cir.1988). Neither of these policy considerations apply to this case. The dispute is not fact intensive as the only material facts are whether or not the BIA has undertaken programmatic consultation. In addition, there is no room for exercise of agency discretion as the provisions of Section 7(a)(2) are clear and mandatory and the Ninth Circuit has clearly set forth the obligations in the *Pacific Rivers.* Finally, exhaustion of administrative remedies would be futile in this case. District courts need not defer to proceedings in an administrative forum if the administrative appeal would be futile or meaningless. *White Mountain Apache Tribe v. Hodel,* 840 F.2d at 677. In this case, the undisputed facts establish that the last time plaintiffs filed an administrative appeal of a BIA decision, the Assistant Secretary of the Interior for Indian Affairs made the challenged decision immediately final and appealable without developing an administrative record. Because the BIA must automatically stay any challenged proposed action

---

5. Actions under Section 7 of the ESA are unique in that they involve at least two different federal agencies, the agency taking action and the agency with which it must consult. Thus, ESA actions are different from the general cases in which a party appeals an administrative determination of a federal agency to federal court.

pending administrative appeal, such as timber harvesting in this case, the BIA has an incentive to short-circuit the administrative appeal process by declaring the decision final. Thus, the court believes that exhaustion would be futile in this case.

*Injunctive Relief*

**A. General standard for injunctive relief**

 As a general rule, a court should enter an injunction only upon a showing of irreparable injury and the inadequacy of legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Generally, courts exercise their discretion by balancing the conveniences of and the possible injuries of the parties. *Id.* However, in cases involving the Endangered Species Act, Congress has removed from the courts their traditional equitable discretion of balancing the parties' competing interests. *National Wildlife Fed. v. Burlington Northern R.R. Inc.,* 23 F.3d 1508, 1511 (9th Cir.1994). The language, history and structure of the ESA establishes that the balance of hardships and public interest tips heavily in favor of protected species. *Id.*

 In this case, the defendants are clearly in violation of the Section 7 consultation requirements of the ESA, thus injunctive relief is appropriate. All that remains for the court to decide is the scope of the injunctive relief.

**B. Scope of injunctive relief**

 Plaintiffs request that the defendants be ordered to commence a programmatic consultation with the FWS on whether their land management plans affect the Mexican spotted owl. As this is a citizen suit, this court has the authority to enjoin an agency from violating section 7 of the ESA under 16 U.S.C. § 1540(g)(1)(A) (1985). As part of its authority to issue injunctive relief under Section 1540 of the ESA, 16 U.S.C. 1540(g)(1)(A), the court may enjoin the agency from continuing activity that has resulted in past violations and, to the extent necessary, may dictate temporarily the actions the agency must take with regard to the activity until the party has submitted to the court an acceptable plan of its own. Once the agency submits a plan that has been agreed to through the Section 7 consultation process, the court applies the arbitrary and capricious standard of review and approves or disapproves the plan. If the court disapproves the plan, it should send the parties back to the drawing board to compose a plan that provides reasonable assurance against continuation of the section 7 violations. *Sierra Club v. Yeutter,* 926 F.2d 429, 439–40 (5th Cir. 1991). Thus, this court clearly has the authority to order the defendants to commence programmatic consultation with FWS on their land management plans.

 Plaintiffs also request, to preserve the *status quo* during consultation and preclude the foreclosure of the development of management systems that adequately protect the owl and its critical habitat, that defendants be enjoined from approving any new activities that involve or require timber harvesting in the USFS Region 3 and on the Navajo Reservation. The Ninth Circuit has held that all timber harvest activities constitute *per se* irreversible and irretrievable commitments of resources under Section 7(d) and cannot go forward during the consultation period. *See Pacific Rivers Council,* 30 F.3d at 1057. Thus, the court also has the authority and is bound by Ninth Circuit law to grant this request.

Finally, the plaintiffs request that the defendants be enjoined from allowing any ground-disturbing action associated with ongoing and or previously announced activities that involve or require timber harvesting if those activities "may affect" the Mexican spotted owl. According to the Ninth Circuit, implementation of the existing LRMPs may affect the Mexican spotted owl. Since the existing LRMPs are not yet the subject of a required programmatic consultation, all timber harvest activities taken pursuant to those LRMPs must be enjoined. *See Pacific Rivers Council,* 30 F.3d at 1055. As a matter of law, the site-specific consultations done on the existing LRMPs does not satisfy the ESA's requirements. In *Pacific Rivers,* the USFS made site-specific determinations on approximately 2,400 projects concluding that about 700 projects were likely to adversely

affect the salmon. The USFS voluntarily suspended activity on the 700 projects but allowed the 1,700 projects that it determined were not likely to adversely affect the salmon to continue. The Ninth Circuit held that the district court erred in interpreting section 7(d) to allow ongoing activities when the USFS had failed to enter into consultation as required by section 7(a)(2). *Pacific Rivers,* n. 30 F.3d at 1052. The Ninth Circuit concluded that the USFS conclusion that the activities may affect the salmon was sufficient to enjoin *all* of the projects. *Id.* In applying the *Pacific Rivers* case, the District of Idaho in *Pacific Rivers Council v. Thomas,* 873 F.Supp. 365 (D.Idaho 1994), enjoined all new, ongoing and announced activities that "may affect" protected salmon in Idaho even though the USFS argued that the actions "not likely to adversely affect" the owl should not be enjoined. Thus, it is clear to this court that all activity must be enjoined under Ninth Circuit law until consultation on the existing and amended LRMPs is complete.

**IT IS THEREFORE ORDERED THAT:** Plaintiffs' partial motion for summary judgment against the USFS and BIA [doc 167] is granted. Defendants' cross motion for summary judgment [doc 185] is denied. Plaintiffs are entitled to partial summary judgment against the USFS and BIA and are entitled to a declaration that the USFS and BIA are in violation of Section 7(a)(2) of the ESA.

**IT IS FURTHER ORDERED THAT:**

(1) The USFS shall immediately commence re-consultation on existing LRMPS in Region 3 in compliance with Section 7(a)(2) of the ESA and its relevant regulations to consider the listing of the Mexican spotted owl as threatened.

(2) Pursuant to Section 7(a)(2) of the ESA, the USFS shall defer or suspend all timber harvest activities taken pursuant to the Region 3 LRMPs until the required consultation commences.[6]

(3) Pursuant to Section 7(d) of the ESA, the USFS shall defer or suspend all timber harvest activities until the re-consultation on existing and amended LRMPS in Region 3 is complete.[7]

(4) The BIA shall immediately commence re-consultation on existing, expired FMP in compliance with Section 7(a)(2) of the ESA and its relevant regulations to consider the listing of the Mexican spotted owl as threatened.

(5) Pursuant to Section 7(a)(2) of the ESA, the BIA shall defer or suspend all timber harvest activities taken pursuant to the expired FMP until the required consultation commences.[8]

(6) Pursuant to Section 7(d) of the ESA, the BIA shall defer or suspend all timber harvest activities until the re-consultation on the FMP is complete.[9]

---

6. *See Pacific Rivers Council,* 30 F.3d at 1055.

7. *See Pacific Rivers Council,* 30 F.3d at 1057.

8. *See Pacific Rivers Council,* 30 F.3d at 1055.

9. *See Pacific Rivers Council,* 30 F.3d at 1057.